[Civ. No. 13200. Fourth Dist., Div. Two. Mar. 20, 1974.]

NORTHERN INYO HOSPITAL, Plaintiff and Respondent, v.
FAIR EMPLOYMENT PRACTICE COMMISSION,
Defendant and Appellant;
LOUISE KELLER, Real Party in Interest and Respondent.

**COUNSEL**

Evelle J. Younger, Attorney General, Robert H. O'Brien, Assistant Attorney General, and Judith T. Ashmann, Deputy Attorney General, for Defendand and Appellant.

Smith & Schaefer and Willis Smith for Plaintiff and Respondent.

No appearance for Real Party in Interest and Respondent.

## OPINION

**TAMURA, J.** — The Fair Employment Practice Commission (hereafter FEPC or Commission) appeals from a judgment in mandate commanding it to vacate a cease and desist order issued against the Northern Inyo Hospital District (Hospital) for an alleged act of racial discrimination in employment practiced upon real party in interest (Mrs. Louise Keller).

Mrs. Keller, an American Indian, filed an unlawful employment practice complaint with the FEPC charging that the Hospital, after granting her sick leave, refused to rehire her solely because of her race. Following an investigation, a formal accusation[1] was served and filed charging the Hospital with discrimination against Mrs. Keller solely because of her race and ancestry in violation of Labor Code section 1420, subdivision (a).[2] The Commission heard the matter itself with a hearing officer of the office of administrative hearings presiding. (Gov. Code, § 11512, subd. (b).[3]) The Commission found that the Hospital had unlawfully discriminated against Mrs. Keller as charged in the accusation and issued a cease and desist order and an order directing the Hospital to pay Mrs. Keller $2,982.40 in lost wages as a result of the unlawful discrimination practiced against her.[4]

Hospital filed a petition for administrative mandamus to review and vacate the FEPC decision on the ground, among others, that the Commission abused its discretion in that its findings "were not supported by the weight of the evidence or substantial evidence in the light of the whole record." At the commencement of the hearing on the petition, Hospital was granted

---

[1]In accordance with the procedures prescribed by the California Fair Employment Practice Act, the investigation was made by one of the commissioners with staff assistance and that commissioner caused the written accusation to be issued and served. (Lab. Code, §§ 1421, 1423.)

[2]Labor Code section 1420, subdivision (a), at that time provided: "It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

"(a) For an employer, because of the race, religious creed, color, national origin, ancestry, or sex of any person, to refuse to hire or employ him or to refuse to select him for a training program leading to employment, or to bar or to discharge such person from employment or from a training program leading to employment, or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

[3]In accordance with Labor Code section 1425, the commissioner who investigated the case and caused the accusation to be issued and served did not participate in the hearings.

[4]Mrs. Keller had in the meantime taken other employment and therefore did not seek reinstatement.

leave to amend by adding an allegation that the FEPC decision "affects fundamental vested rights of Petitioner, to establish employment practices and procedures and to impose conditions to employment at Petitioner's hospital facility." The cause was thereafter argued and submitted on the petition, the Commission's answer, and the administrative record.

The evidence adduced at the FEPC hearing may be summarized as follows:

The Hospital at which Mrs. Keller was employed is located in Bishop, California, and is owned and operated by the Northern Inyo Local Hospital District, a public district. Mrs. Keller commenced working for Hospital in its kitchen and laundry in 1960 and eventually was appointed laundry supervisor. On August 17, 1970, upon learning that she needed minor surgery, she asked the Hospital administrator (Mr. McConnell) if she would be allowed to return to work if she should undergo surgery. She testified that Mr. McConnell replied that she could return to work. Mrs. Keller thereupon applied for a leave of absence without pay (her sick leave having previously been fully used) and underwent surgery. The day she was released from the hospital (Sept. 11, 1970), she received a letter from Mr. McConnell informing her that her leave of absence had been approved and that "[t]he policy of the Board is that return to work will be contingent on the availability of the work load at that time."

On October 28, 1970, Mrs. Keller obtained a release from her physician to return to work. She went to the Hospital that day and told Mr. McConnell she was ready to return to work. McConnell told her to see Jim Stewart who had apparently taken Mrs. Keller's place as supervisor of the laundry. Mr. Stewart informed Mrs. Keller that no help was needed at that time. Mrs. Keller replied she would be available for work should there be an opening.

In early November 1970, Mrs. Keller wrote a letter to the board of directors and the advisory committee of the Hospital complaining that she had not been rehired. The letter concluded with the following statements: "I have never mentioned this to anyone, but I feel in some way that discriminating [sic] is here somewhere. If I did not do my job, I think I should have been told." Hospital's attorney, Mr. Smith, replied by letter dated November 13, stating the leave of absence made return to work contingent upon availability of work. He stated it was his understanding that no work was then available but that she would be called when there was an opening. Although he suggested that she could appear before the board of directors to discuss her employment, Mrs. Keller apparently did not do so. Mrs.

Keller admitted talking to a Pat Ford of the California Legal Indian Service about the time she wrote her letter to the Hospital.

There was evidence that although three openings thereafter became available at the laundry Mrs. Keller was not called to fill any of these positions.

Mrs. Keller testified that she felt she was discriminated against on account of her Indian ancestry because Hospital had granted leaves of absence to several non-Indian female workers and had subsequently rehired them. The fact that certain named Caucasian employees had been on sick leave and subsequently returned to their jobs was corroborated by a consultant to the FEPC who investigated the case.

Mr. McConnell testified that the workers who had been rehired after sick leave were nurses whose skills were in short supply; initially Mrs. Keller was not rehired because the laundry was partially shut down for remodeling; Mrs. Keller's November 1970 letter, more particularly her statement that "I feel in some way that discriminating [sic] is here somewhere," "put a doubt in [his] mind"; he admitted there was a job available sometime in November of 1970 but testified that the letter and Mrs. Keller's subsequent complaint to the FEPC (Jan. 16, 1971) persuaded him not to rehire her because he was afraid that to do so would be an admission that Hospital had discriminated against her. He denied that there had been any discrimination against Mrs. Keller because of her racial ancestry.

An FEPC employment pattern survey form filled out by Hospital and received in evidence at the FEPC hearing indicates that the Hospital employs 140 persons, of whom 24 are members of a minority group. Of the 24, 18 are minority group members who are neither Negro nor Oriental, and 6 are persons of Mexican, Central or South American ancestry. One of the 18 persons in the former category is designated a supervisor.[5] Twenty-four nonminority persons are designated supervisors.

Mr. McConnell testified that the population of the City of Bishop is more than 3,000, the population of its immediate vicinity is 9,000 and the population of the county is 16,000. Mrs. Keller testified that the Indian population of the Bishop Indian Reservation, the City of Bishop and the surrounding areas numbered 900 persons, 825 of whom lived on the reservation.

---

[5]Mrs. Keller testified that, as far as she knew, she was the only American Indian employed in a supervisorial capacity at the time of her employment by Hospital. However, the survey form indicating the employment of one American Indian in a supervisorial capacity was apparently filled out by Hospital in connection with the FEPC investigation at a time when Mrs. Keller was no longer employed by Hospital. The evidence is therefore inconclusive as to whether Hospital employed one or two American Indians in a supervisorial capacity.

The Commission found that Mrs. Keller was granted a medical leave of absence on or about August 17, 1970, with the understanding that she would be entitled to the first available position for which she was qualified; on October 28, 1970, Mrs. Keller became available for reemployment and was again assured by the Hospital that she would be rehired when the first available position developed; since that time positions have developed for which Mrs. Keller was qualified but others were hired for those positions; the failure to reemploy Mrs. Keller was due solely to her race or ancestry.

The court below determined that the FEPC decision "affects fundamental vested rights of [the Hospital] to establish practices and procedures and to impose conditions to employment at [its] hospital facility" and that the court was therefore authorized to exercise its independent judgment on the weight of the evidence. The court found it to be true that Mrs. Keller was granted a medical leave of absence; that she became available for re-employment on October 28, 1970; and that the Hospital failed to rehire her. However, the court found that the failure to rehire was not because of Mrs. Keller's race or ancestry and that the Hospital did not violate Labor Code section 1420, subdivision (a). Judgment was entered directing the issuance of a peremptory writ of mandate ordering the FEPC to vacate its decision.

The FEPC contends (1) that the substantial evidence rather than the independent judgment rule should have been applied in reviewing its decision and (2) that there was substantial evidence in the light of the entire record to support the Commission's decision and that the judgment should therefore be reversed with directions to enter judgment for the Commission. From the analysis which follows, we have concluded that the foregoing contentions must be upheld.

## I

The basic framework for the rules governing judicial review of any final order or decision rendered by a state or local administrative agency is provided by Code of Civil Procedure section 1094.5. (*Bixby* v. *Pierno,* 4 Cal. 3d 130, 137 [93 Cal.Rptr. 234, 481 P.2d 242].) Subdivision (c) of the section provides: "(c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence; and in all other cases abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."

The FEPC advances two arguments in support of its position that the substantial evidence rule should govern the scope of review of the decision in question. It urges: (1) The FEPC is an agency deriving its adjudicatory powers from the California Constitution and (2) even assuming that its adjudicatory powers are not so derived, fundamental vested rights of the Hospital were not affected by the decision.

Regardless of the nature of the rights affected, the substantial evidence rule defines the scope of review of decisions of statewide administrative agencies on which the Constitution has specifically conferred adjudicating powers. (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 141, fn. 7; *Martin* v. *Alcoholic Bev. etc. Appeals Bd.,* 52 Cal.2d 287, 291 [341 P.2d 296]; Cal. Administrative Mandamus (Cont.Ed.Bar) § 5.67 [Jan. 1974 Supp., § 5.63A, p. 33].) The theory on which the FEPC bases its contention that it is a state agency of constitutional origin is that the Department of Industrial Relations was created by the Legislature pursuant to the powers conferred upon it by California Constitution, article XX, section 17½;[6] the Fair Employment Practices Division is one of the nine divisions comprising the department (Lab. Code, § 56); the FEPC is a subdivision of the Division of Fair Employment Practices. (Lab. Code, § 1414.) We are not persuaded.

■ The question whether the FEPC is a constitutional agency is not entirely one of first impression. In *Stearns* v. *Fair Employment Practice Com.,* 6 Cal.3d 205 [98 Cal.Rptr. 467, 490 P.2d 1155], the court, without elaboration, referred to findings of the FEPC as findings "of a state-wide administrative agency that lacks judicial power under the state Constitution, . . ." (6 Cal.3d 205, 211.) The legislation establishing the FEPC substantiates the view that the Commission's adjudicating power is of legislative rather than of constitutional origin. In enacting the California Fair Employment Practice Act (Stats. 1959, ch. 121), the act which created

---

[6]California Constitution, article XX, section 17½, as amended in 1970, provides: "The Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission legislative, executive, and judicial powers."

Prior to the 1970 amendment, the section read: "The Legislature may, by appropriate legislation, provide for the establishment of a minimum wage for women and minors and may provide for the comfort, health, safety and general welfare of any and all employees. No provision of this Constitution shall be construed as a limitation upon the authority of the Legislature to confer upon any commission now or hereafter created, such power and authority as the Legislature may deem requisite to carry out the provisions of this section."

In preparing the 1970 amendment, the California Constitutional Revision Commission stated: "The proposed section restates more concisely the substance of the existing provisions without change in meaning, except that the Section is extended to all employees rather than just women and minors." (Cal. Const. Revision Com. 1970, part 3, Proposed Revisions of the Cal. Const.)

the Commission and defined its powers, the Legislature declared: "This part [Lab. Code, div. 2, pt. 4.5] shall be deemed an exercise of the *police power of the State* for the protection of the public welfare, prosperity, health and peace of the people of the State of California." (Italics supplied.) (Lab. Code, § 1411.) It did not purport to act under the powers granted to it by article XX, section 17½ of the Constitution. The FEPC is therefore an agency of legislative origin and its adjudicatory power is not traceable to a specific provision of the Constitution.[7] (See Cal. Administrative Mandamus (Cont.Ed.Bar) app. A, p. 351 [Jan. 1974 Supp., app. A, p. 140].)

■ Thus the applicability of the independent judgment rule turns on the nature of the right affected by the FEPC decision.[8] The trial court determined that the decision affected a fundamental vested right of the Hospital.

We cannot agree with that determination. In reviewing the theoretical basis for the independent judgment rule, our high court in *Bixby* v. *Pierno, supra,* 4 Cal.3d 130, noted that courts have undertaken careful judicial scrutiny where administrative decisions substantially affect individual or minority rights but that in the area of economic due process, courts have permitted the legislative and executive branches of government to deal with the economic and social problems with less judicial interference. "[T]he courts have given less emphasis to outmoded rights of property and to shibboleths of freedom of contract." (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130,

---

[7]The FEPC directs our attention to the fact that article XX, section 17½ of the Constitution, as amended in 1970, expressly provides that the Legislature may confer on a commission established to carry out the purposes of the section "legislative, executive and judicial powers." Inasmuch as the Legislature did not purport to act under article XX, section 17½ in enacting the Fair Employment Practice Act, we need not decide whether the Legislature could validly confer "judicial powers" upon the FEPC pursuant to the constitutional provision.

[8]Two law journal articles suggest that a court reviewing a decision of the FEPC is not limited to determining whether the Commission's findings are supported by substantial evidence, but can examine the evidence to determine if the decision accorded with the weight of that evidence. (*The California FEPC: Stepchild of the State Agencies,* 18 Stan.L.Rev. 187, 193; *California's Approach to Racial Discrimination in Employment,* 5 U.S.F. L.Rev. 404, 412-413.) Both articles, however, were written prior to *Bixby.* The cases cited in the articles were decided by a superior court (*Andrews* v. *Atchison, T. & S.F.R.R.,* Civ. No. 771003, Super.Ct.L.A., Cal., Jan. 29, 1962 [LA-1(FEP 60-B-037)]; *Ramsey* v. *T. H. Wilton Co.,* No. SF-1 (FEP 60-A-239); *McNeil* v. *Guy F. Atkinson Co.,* No. SF-3 (FEP 60-A-215), and apparently no appeal was ever taken from the decisions. In *International Union etc. Engineers* v. *Fair Emp. Practice Com.,* 276 Cal.App.2d 504, 507 [81 Cal.Rptr. 47], cited as authority in one of the articles, the trial judge, after an independent review of the evidence, upheld the Commission's finding of discrimination, and the reviewing court affirmed. Consequently, the question whether the trial judge applied the proper scope of review was neither discussed nor decided.

142.) *Bixby* observed that "[i]n determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation." (4 Cal.3d 130, 144.) As general guidelines for determining whether an administrative decision substantially affects fundamental vested rights, the court stated that the determination must be made on a case-by-case basis and that although the California rule provides no fixed formula, it does perform a "precious function in the protection of the rights of the individual." (4 Cal.3d 130, 146-147.)

Applying *Bixby* guidelines, Hospital's right to establish its employment practices and procedures and to impose conditions of employment can in no sense be termed a fundamental vested right. While the right to pursue a lawful business or occupation is a fundamental right (*Truax* v. *Raich,* 239 U.S. 33, 41 [60 L.Ed. 131, 135, 36 S.Ct. 7]; *Purdy & Fitzpatrick* v. *State of California,* 71 Cal.2d 566, 579 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]), there is no vested right to conduct a business free of reasonable governmental rules and regulations (see *Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 145-146; *Beverly Hills Fed. S. & L. Assn.* v. *Superior Court,* 259 Cal.App.2d 306, 316-317 [66 Cal.Rptr. 183]). Hospital's claim that it has a vested right to establish its employment practices and procedures is based upon the discredited concept of freedom of contract. (*Day-Brite Lighting, Inc.* v. *Missouri,* 342 U.S. 421, 423 [96 L.Ed. 469, 472, 72 S.Ct. 405]; *West Coast Hotel Co.* v. *Parrish,* 300 U.S. 379, 392-393 [81 L.Ed. 703, 708-709, 57 S.Ct. 578, 108 A.L.R. 1330]; *Prudential Ins. Co.* v. *Cheek,* 259 U.S. 530, 536 [66 L.Ed. 1044, 1051, 42 S.Ct. 516, 27 A.L.R. 27].) Its vested right argument is rendered even more tenuous by the fact that it is a public agency (a local hospital district). As such it is subject to state laws in promulgating regulations governing the employment and removal of personnel. (*Raymond* v. *Christian,* 24 Cal.App.2d 92, 102 [74 P.2d 536]; 26 Cal.Jur.2d, Hospitals and Asylums, § 5.)

The court below erred in exercising its independent judgment on the weight of the evidence in reviewing the decision of the FEPC.[9]

## II

The question remains whether a different result would have been required in the case at bench under the substantial evidence rule. ▇ This

---

[9]Since the FEPC found in Mrs. Keller's favor, no argument is made that its decision substantially affected her fundamental right to continue in her employment. Our decision thus will not preclude the use of the independent judgment test by a trial court in reviewing an FEPC decision unfavorable to an employee in Mrs. Keller's position.

rule requires a review of the entire record to determine whether findings of an administrative decision are supported by substantial evidence. (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 143, fn. 10; *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control,* 2 Cal.3d 85, 94 [84 Cal.Rptr. 113, 465 P.2d 1].) We may not isolate only the evidence which supports the administrative finding and disregard other relevant evidence in the record. (See *LeVesque* v. *Workmen's Comp. App. Bd.,* 1 Cal.3d 627, 638-639, fn. 22 [83 Cal.Rptr. 208, 463 P.2d 432]; Cal. Administrative Mandamus (Cont.Ed.Bar) Jan. 1974 Supp., § 5.75.) On the other hand, neither we nor the trial court may disregard or overturn the Commission's finding " 'for the reason that it is considered that a contrary finding would have been equally or more reasonable.' " (*Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control, supra,* 2 Cal.3d 85, 94; *Bowman* v. *Alcoholic Bev. etc. Board,* 171 Cal.App.2d 467, 471-472 [340 P.2d 652].)

The ultimate issue in an administrative mandamus proceeding is whether the agency abused its discretion. An abuse of discretion is "discretion exercised to an end or purpose not justified by and clearly against reason, all of the facts and circumstances being considered." (*Brown* v. *Gordon,* 240 Cal.App.2d 659, 666-667 [49 Cal.Rptr. 901]; *Schaub's, Inc.* v. *Dept. Alc. Bev. Control,* 153 Cal.App.2d 858, 866 [315 P.2d 459].) Unless the finding, viewed in the light of the entire record, is so lacking in evidentiary support as to render it unreasonable, it may not be set aside.

The following evidence supports the Commission's findings:

Mrs. Keller took a leave of absence only after receiving assurance from the Hospital administrator that she would be able to return to work; as soon as she was released by her physician, she made herself available for work but was denied reemployment on the ground that there were then no openings; as openings thereafter developed, they were filled by non-Indians; non-Indian employees were rehired after extended sick leave; there was no evidence that Mrs. Keller had been an unsatisfactory worker or was otherwise unqualified or unfit for reemployment. From the foregoing evidence, it may be reasonably inferred that the failure to reinstate Mrs. Keller was due to her race.

The Hospital's explanation that the non-Indian employees who were permitted to return to work after leaves of absence were nurses who were in short supply infers that the reason Mrs. Keller was not rehired was because a job was not available. However, the Hospital administrator admitted that "we could have possibly made a job as early as November 1970."

The Hospital administrator indicated that Mrs. Keller was not rehired because in her letter to the board of directors she expressed concern that

there might be discrimination. He testified that the letter put a "doubt" in his mind. Labor Code section 1420, subdivision (e), specifically makes it unlawful to discriminate against a person for opposing practices forbidden by the Fair Employment Practice Act or because he or she has filed a complaint with the Commission.[10] Subdivision (e) was designed to implement the basic objective of the act—elimination of discrimination in employment—by making it unlawful for an employer to retaliate against a person for asserting a right granted by the act. Although the accusation against the Hospital did not include an allegation of a violation of subdivision (e), evidence that the Hospital administrator failed to rehire Mrs. Keller because her reference to possible discrimination created a "doubt" in his mind was relevant to the charge of racial discrimination in employment. Absence of discriminatory intent is irrelevant; what counts is the effect of the employer's action. (*Spurlock* v. *United Airlines, Inc.*, 475 F.2d 216, 218.) In the circumstances of the present case, the failure to rehire Mrs. Keller because the Hospital administrator felt that to do so would be tantamount to an admission of discrimination resulted in a denial of a reemployment privilege on account of race.

Discrimination is practiced in many subtle and elusive ways; rarely is there evidence of open and notorious discrimination. The FEPC has been entrusted with the duty of effectuating the declared policy of the state to protect and safeguard the rights and opportunities of all persons to seek, obtain and hold employment without discrimination. (Lab. Code, § 1411.) It has been declared by the Legislature that the opportunity to seek, obtain and hold employment without discrimination because of race is a civil right. (Lab. Code, § 1412.) The special field in which the Commission acts requires expertise developed through the investigation of employment practices and procedures in a multitude of cases and situations.[11] If there is a reasonable evidentiary basis for its finding, it should not be set aside simply because a contrary finding may appear to be equally reasonable. Upon a review of the entire record, it is our conclusion that the Commission did not abuse its power in finding that the failure to rehire Mrs. Keller constituted racial discrimination in employment.

---

[10]Labor Code section 1420, subdivision (e), provides: "It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

". . . . . . . . . . . . . .

"(e) For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this act or because he has filed a complaint, testified or assisted in any proceeding under this part."

[11]See Tobriner, *California FEPC,* 16 Hastings L. J. 333, 337-342, for a brief survey of the Commission's activities during its first five years of operation.

In view of our determination that there was substantial evidence in the light of the whole record to support the Commission's finding, the judgment should be reversed with directions to enter a judgment denying the petition for writ of mandate. Under the substantial evidence rule, the scope of appellate review of a trial court's decision is identical to that of the trial court. (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 149; *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control, supra,* 2 Cal.3d 85, 94-95; *Merrill* v. *Department of Motor Vehicles,* 71 Cal.2d 907, 916 [80 Cal. Rptr. 89, 458 P.2d 33].) A reversal with directions to deny the petition does not involve an usurpation of the fact-finding power of the trial court.

## DISPOSITION

The judgment is reversed with directions to enter judgment denying the petition for writ of mandate.

Kerrigan, Acting P. J., concurred.

**KAUFMAN, J.**—I respectfully dissent.

The scholarly majority opinion closes its eyes to what actually happened in this case, unnecessarily reaches the question of the proper scope of review of FEPC proceedings and, to make matters worse, announces as proper a scope of review which will necessarily vary depending upon which party prevails at the FEPC hearing.

Before proceeding, it appears to me appropriate to set forth some additional facts not recognized by the majority. In 1969, prior to the 1970 episode, Mrs. Keller was granted sick leave on the understanding she could return to work only on a part-time basis because the laundry was to be renovated. Thereafter she returned to work on a part-time basis and was eventually restored to full-time employment. In fact, although she was reluctant to assume the responsibility, Mrs. Keller was thereafter appointed laundry supervisor. It is inconceivable that, in connection with the present episode, Mrs. Keller was not reemployed because of her Indian ancestry, when one year previously, she was reemployed after a sick leave and thereafter promoted to laundry supervisor. I note also that 18 of Hospital's 140 employees are American Indians.

What actually happened in this case becomes quite apparent when one reads the findings and decision of the FEPC, the full text of which is attached hereto as Appendix A. Based on faulty arithmetic *(infra),* the FEPC decided that Northern Inyo Hospital had failed to implement a satisfactory affirmative action program (see findings III-B. and IV) and decided

to encourage the establishment of such a program by holding the hospital liable to Mrs. Keller in the present case (see findings III-B., IV and V).

It is unnecessary in this case to reach the question of the proper scope of review of FEPC proceedings. As I read the findings of the FEPC, finding V is made to depend to a considerable degree upon finding IV, and finding IV is not supported by the evidence whether one employs the substantial evidence test or the independent judgment test. Finding IV begins with the premise that Bishop, California, the situs of Hospital, has a population of approximately 3,000 persons, about one-third of whom are American Indians. The uncontradicted evidence was that the Indian population of the area surrounding Bishop, California, including the Bishop Indian Reservation, the City of Bishop, and surrounding areas, was 900 persons, of whom 825 lived on the reservation. The uncontradicted evidence was that the total population of the immediate vicinity of Bishop was 9,000 persons. The percentage of American Indians to non-Indians is therefore 10 percent, not one-third as found by the FEPC.

Were it necessary to reach the question of the proper scope of review of FEPC proceedings, I would hold that regardless of who prevailed before the FEPC, the appropriate scope of review is independent judgment review. In the first place, that that scope of review is the proper one is implied in several cases. (See *Stearns* v. *Fair Employment Practice Com.*, 6 Cal.3d 205, 211 [98 Cal.Rptr. 467, 490 P.2d 1155] [citing *Bixby* v. *Pierno*, 4 Cal.3d 130 (93 Cal.Rptr. 234, 481 P.2d 242)]; *International Union etc. Engineers* v. *Fair Emp. Practice Com.*, 276 Cal.App.2d 504, 507 [81 Cal. Rptr. 47].)

Secondly, I am not so certain as are the majority that no fundamental, vested right is here involved. Prior to the *Bixby* case, the criterion was whether or not the right affected or involved was vested. (See e.g., *Merrill* v. *Department of Motor Vehicles*, 71 Cal.2d 907 [80 Cal.Rptr. 89, 458 P.2d 33]; *McDonough* v. *Goodcell*, 13 Cal.2d 741 [91 P.2d 1035, 123 A.L.R. 1205]; *Laisne* v. *Cal. St. Bd. of Optometry*, 19 Cal.2d 831 [123 P.2d 457]; Cal. Administrative Mandamus (Cont.Ed.Bar) pp. 80-86.) I do not understand the extensive dicta in *Bixby* as restricting the old rule by adding a requirement that the right be also fundamental. Indeed, "in determining whether the right is sufficiently basic and fundamental to justify independent judgment review, the courts have considered the degree to which that right is 'vested,' that is, already possessed by the individual." (*Bixby* v. *Pierno, supra*, 4 Cal.3d at p. 146; see also *Toczauer* v. *State Bd. of Registration*, 20 Cal.App.3d 1067, 1069 [98 Cal.Rptr. 211].)

Moreover, the question arises at what point do we ascertain the right involved or being affected. When the present case was pending in the superior court on Hospital's petition for writ of mandate, it was not alone Hospital's right to have employees of its own choosing that was involved or affected. The ruling of the superior court would necessarily affect Mrs. Keller's right to employment free of racial discrimination as well. What the majority holds is that since Mrs. Keller prevailed before the FEPC, a substantial evidence review is proper; whereas, if Hospital had prevailed at the FEPC hearing,[1] an independent judgment review would be proper. Thus, the majority makes the scope of review dependent upon which party prevailed before the FEPC. Such a rule does not commend itself to me.

If independent judgment review has any merit at all, it should be applied to proceedings of the FEPC. The FEPC is not an impartial adjudicatory body. It is charged with the enforcement of the California Fair Employment Practice Act. (Lab. Code, § 1419.) As in the present case, it acts both as the accuser and the adjudicator. Although an independent hearing officer is employed to preside at adjudicatory hearings, it is the Commission that renders the decision. The findings and decision of the FEPC in the present case (see Appendix A) are reminiscent of nothing so much as a chapter out of the Spanish Inquisition. The status and procedure of the FEPC cry out for independent judicial review of FEPC adjudicatory decisions.

As to the FEPC's contention that the uncontradicted evidence discloses a violation of Labor Code section 1420, subdivision (e), it is sufficient to note that no violation of this subdivision of section 1420 was charged, and Hospital was never called upon to defend against such a charge. "The rule is well settled that the theory upon which a case is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." (*Ernst* v. *Searle,* 218 Cal. 233, 240-241 [22 P.2d 715]; *Gyerman* v. *United States Lines Co.,* 7 Cal.3d 488, 499 [102 Cal.Rptr. 795, 498 P.2d 1043].)

I would affirm the judgment of the trial court.

---

[1]We were advised at oral argument that the employer never prevails at formal FEPC proceedings, because groundless complaints are weeded out and eliminated by investigation prior to the advent of formal proceedings.

## APPENDIX A

### BEFORE THE FAIR EMPLOYMENT PRACTICE COMMISSION
### OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Accusation ) | CASE No. FEP 70-71 B6515 |
| of ) | L-1319 |
| NORTHERN INYO HOSPITAL, ) | |
| Respondent. ) | |

### DECISION

This matter came on regularly for hearing before the Fair Employment Practice Commission of the State of California, at Los Angeles, California, on May 18, 1972, at the hour of 9:30 a.m. Milford A. Maron, Hearing Officer of the Office of Administrative Hearings, presided. Charles E. Wilson, Counsel, appeared on behalf of the Fair Employment Practice Commission. The Respondent, Northern Inyo Hospital, was represented by Willis Smith, Esquire, its Counsel. During the entire proceedings a quorum of the Fair Employment Practice Commission was present, consisting of Pier Gherini, Chairman, and C. L. Dellums and Catherine L. Montgomery, members. Evidence both oral and documentary having been received, the Fair Employment Practice Commission makes the following findings of fact:

### I

A. Stella C. Sandoval made the Accusation in her official capacity as Commissioner for the Fair Employment Practice Commission.

B. On January 16, 1971, Complainant, Louise Keller, filed a written verified complaint with the Fair Employment Practice Commission, alleging that she had been discriminated against by the Respondent solely because of her ancestry in violation of Section 1420(a) of the Labor Code, and that said violation occurred within the preceding one year.

### II

Respondent, Northern Inyo Hospital, is a public entity of the Northern Inyo County Local Hospital District, and is thereby a political subdivision of the State of California. The Respondent is the employer of 140 persons at its hospital facility in Bishop, California. Complainant, an American Indian, is and was, at all times pertinent herein, qualified for reemployment with Respondent as a laundry employee or in another unskilled capacity.

### III

#### Public Policy

A. The opportunity to seek, obtain, and hold employment without discrimination because of race or ancestry is recognized in the State of California as a *civil right*. The public policy of this State declares that the practice of denying employment opportunity, and discriminating in the terms of employment because of race, religious creed, color, national origin, ancestry, or sex foments domestic strife and unrest, and deprives the community of the fullest capacity for its development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general. The enforcement of this policy is for the protection of the public welfare, prosperity, health, and peace of the State, and is, therefore, viewed liberally to accomplish such purposes.

B. The Fair Employment Practice Commission believes that more than mere passive compliance with the letter of the California Fair Employment Practice Act is essential in order to accomplish its purposes; thus, the spirit of the law calls for a dynamic and comprehensive program of affirmative action to be sustained by employers on a high priority basis. This should all the more be true when the employer is a public agency entrusted with *public* responsibilities.

## IV
### Affirmative Action Program

Bishop, California, the situs of the hospital, has a population of approximately 3,000 persons, about one-third of whom are American Indians. Respondent's ethnic pattern of staffing as of October 17, 1971, established that twenty-four (24) of its 140 employees, or 17.1%, were members of minority groups, while only eighteen (18), or 12.8% of these employees were American Indians. In the supervisory categories only one (1) of Respondent's twenty-five (25) supervisors, or 4%, was a minority member and an American Indian. These raw statistics are helpful in placing the facts found in Finding V within an understandable context and points out Respondent's reluctance to establish an elightened [*sic*] affirmative action program in accordance with State policy.

## V
### Gravamen

A. The evidence established that Complainant, a long-term employee of Respondent, was granted a medical leave of absence on or about August 17, 1970, with the understanding that she would be entitled to the first available position for which she was qualified.

B. On October 28, 1970, Complainant again became available for reemployment, and was again reassured by Respondent that she would be rehired when the first available position developed. Since that time positions have developed for which she was qualified, but others have been hired for said positions. The failure to reemploy Complainant was due solely to her race or ancestry.

\* \* \* \* \* \* \*

Pursuant to the foregoing findings of fact, the Fair Employment Practice Commission makes the following determination of issues:

The Respondent, Northern Inyo Hospital, a political subdivision of the State of California, has discriminated against the Complainant, Louise Keller, solely because of her race or ancestry in violation of Section 1420(a) of the Labor Code of the State of California.

\* \* \* \* \* \* \*

WHEREFORE, THE FOLLOWING ORDER is hereby made:

The Respondent, Northern Inyo Hospital, a political subdivision of the State of California, and its agents and employees, shall cease and desist from engaging in acts of discrimination against Complainant, Louise Keller, solely because of her race or ancestry, and shall forthwith pay to said Complainant the sum of $2,982.40, being that sum of wages reasonably lost and legally chargeable to the unlawful discrimination practiced by Respondent on Complainant.[1]

\* \* \* \* \* \* \*

In compliance with Section 1426 of the Labor Code, reference is hereby made to

---

[1]Although the Complainant would also be entitled to reinstatement under this record, she has since accepted other employment, and, therefore, does not seek such relief. [Fn. in the original.]

Section 11523 of the Government Code and Section 1094.5 of the Code of Civil Procedure, which prescribe the rights of appeal of any party adversely affected thereby.

\* \* \* \* \* \* \*

This Decision shall become effective on the 10th day of July, 1972.

IT IS SO ORDERED this 10th day of Jan., 1972.

FAIR EMPLOYMENT PRACTICE COMMISSION

By _____

PIER CHERINI, Chairman